UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:13-cv-21104-MORENO/OTAZO-REYES

DARLENE DIAZ, an individual,
on behalf of herself and all others
similarly situated,

       Plaintiff,

                              **CLASS ACTION**

v.                                  **JURY DEMAND**

HSBC BANK USA, N.A.; HSBC MORTGAGE
CORP.; HSBC FINANCE CORP.; BENEFICIAL
COMPANY, LLC; BENEFICIAL FINANCIAL I,
INC.; HFC COMPANY, LLC; HSBC CONSUMER
LENDING (USA), INC.; HSBC MORTGAGE
SERVICES, INC.; ASSURANT, INC.;
AMERICAN SECURITY INSURANCE
COMPANY; and STANDARD GUARANTY
INSURANCE COMPANY;

       Defendants.

_____/

## AMENDED CLASS ACTION COMPLAINT

      Plaintiff Darlene Diaz files this amended class action complaint on behalf of herself and

all others similarly situated against HSBC BANK USA, N.A. ("HSBC Bank"), HSBC

MORTGAGE CORPORATION ("HSBC Mortgage"), HSBC FINANCE CORP.; BENEFICIAL

COMPANY, LLC; BENEFICIAL FINANCIAL I, INC.; HFC COMPANY, LLC; HSBC

CONSUMER LENDING (USA), INC.; HSBC MORTGAGE SERVICES, INC.; ASSURANT,

INC. ("Assurant"), STANDARD GUARANTY INSURANCE COMPANY ("SGIC"); and

AMERICAN SECURITY INSURANCE COMPANY ("American Security" or "ASIC"). [1]

---

[1] The HSBC entities will be referenced together as the "HSBC Defendants." Assurant, ASIC,
and SGIC may be referenced together as the "Assurant Defendants."

## INTRODUCTION

1.      On November 10, 2010, *American Banker* published an article describing major mortgage lenders' and servicers' questionable and often illegal practices related to force-placed insurance.  The article revealed for the first time the exceptionally profitable exclusive relationships, collusive activities, and circular arrangements among the mortgage lenders and servicers, their affiliates, and their cooperating insurers, most of which have since been sued in numerous cases proceeding across the country.

2.      Lenders and servicers force place insurance when a borrower fails to obtain or maintain proper hazard insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

3.      The arrangements revealed by *American Banker* yield participants in these force-placed insurance schemes hundreds of millions of dollars annually. Just two insurance companies control the entire market for forced-placed policies in the country—Assurant and QBE.  Assurant works through its subsidiaries Standard Guaranty Insurance Company and American Security Insurance Company.  These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay unearned "kickbacks" of a percentage of the force-placed premiums ultimately charged to the borrower, offer them subsidized administrative services, and/or enter into lucrative captive reinsurance deals with them.

4.      The money to finance the forced-place insurance schemes comes from

unsuspecting borrowers who are charged inflated force-placed insurance premiums by lenders. In many instances, borrowers are required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5.      These schemes take advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements.  The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's hazard policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6.      Although force-placed insurance is designed to protect the lender's interest in the property securing the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk.  And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market and artificially inflate the premiums charged to consumers, resulting in premiums up to *ten times* greater than those available to the consumer in the open market.  *American Banker* reported that "[t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry— even after accounting for the generous commissions and other payments that servicers demand." *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 10, 2010), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that these schemes have reaped in recent years:[2]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                          13                          August 9, 2012

8.     As illustrated below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.[3]  Together, Assurant and QBE/Balboa controlled 99.7% of the market in the same year, and held no less than 96.1% between 2004 and 2011.[4]

---

[2] The following graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _presentation_birnbaum.pdf

[3] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _presentation_birnbaum.pdf

[4] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The

## Assurant and QBE Are the Market for LPI:
## Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                              18                              August 9, 2012

9.      It is no surprise that these practices have come under increased scrutiny in recent

years by the government and regulators.  For example:[5]

- After August 2012 NAIC hearings, the state regulator from Louisiana, James
  Donelon, referred to the force-placed insurance market as a "monopoly" and
  stated that stricter regulations may be needed.[6]

- The New York Department of Financial Services ("NYDFS") held hearings on

---

presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance
_presentation_birnbaum.pdf

[5] These practices have also come under increased scrutiny by the courts.  This Court has already
certified a Florida class against Wells Fargo Bank and Wells Fargo Insurance, Inc. (as well as
their exclusive FPI carrier QBE) on the same practices described herein. *See Williams v. Wells
Fargo Bank, N.A.*, Case No. 11-cv-21233 (S.D. Fla.) [D.E. 211].

[6] *See* Zachary Tracer & David Beasley, *U.S. Regulators to Examine Force-Placed Insurance*.
BLOOMBERG BUSINESSWEEK, Aug. 10, 2012 *available at*:
http://www.businessweek.com/news/2012-08-10/u-dot-s-dot-regulators-to-examine-forced-
place-insurance.

May 17, 2012 related to the force-placed insurance market. In his opening statement, the Superintendent of Financial Services Benjamin Lawsky stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included; 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. He went on to state:

> "In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions…"

- The NYDFS recently released its Assurant FPI investigation findings in a Consent Order. The terms of the Consent Order apply to ASIC and other Assurant subsidiaries. The Agreement in the Consent Order provides that Assurant:
  - o shall not issue force-placed insurance on mortgaged property serviced by a servicer affiliated with Assurant;
  - o shall not pay commissions to a servicer or a person or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer;
  - o shall not reinsure force-placed insurance with a person or entity affiliated with the servicer that obtained the policies;
  - o shall not pay contingent commissions based on underwriting profitability or loss ratios;
  - o shall not provide free or below-cost outsourced services to servicers, lenders, or their affiliates; and
  - o shall not make any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business.

10.     Florida has now become the epicenter for these force-placed insurance schemes.

In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:[7]

---

[7] This graph is taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf

Case No. 1:13-cv-21104-MORENO/OTAZO-REYES

**LPI Premium by State:  Florida Has Become Ground Zero**

|      | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|------|-------|-------|-------|-------|-------|-------|-------|-------|
| FL   | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA   | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX   | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY   | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL   | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ   | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI   | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH   | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA   | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA   | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                         August 9, 2012

11.     Furthermore, Assurant, the largest force-placed insurance provider with approximately 65% of the market, maintains one of its main offices in Miami, Florida. Assurant's actuary department, including its lead actuary, which sets the force-placed rates for the entire country, is housed in the South Florida office.

12.     This self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiff and the putative classes she seeks to represent across the country.  This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of hazard insurance by the lenders and mortgage servicers, their affiliates, and their cooperating insurers.

13.     Upon information and belief, the HSBC Defendants have entered into agreements with the Assurant Defendants pursuant to which the HSBC Defendants and/or their subsidiaries/affiliates: (a) receive a portion of the premiums for each force-placed insurance policy purchased for a borrower; (b) assume a portion of the force-placed insurance policies originally written by force-placed insurance providers without any real or commensurate transfer of risk; and/or (c) receive services in kind.  Upon information and belief those arrangements are exclusive.  *See* Assurant, Inc. Form 10-K for the year ending December 31, 2011, filed on

February 23, 2012, at 4 ("Assurant Specialty Property establishes long-term relationships with leading mortgage lenders and servicers. The majority of our lender-placed agreements are exclusive. Typically these agreements have terms of three to five years and allow us to integrate our systems with those of our clients.").

## PARTIES

14.     Plaintiff DARLENE DIAZ is a citizen of the State of Florida. She is a natural person over the age of 21 and otherwise *sui juris*.

15.     Defendant HSBC MORTGAGE CORPORATION operates as a mortgage lender, originator, and servicer in the United States and the District of Columbia. HSBC Mortgage is a Delaware corporation with its principal place of business in Depew, New York. Upon information and belief, HSBC Mortgage operates as a wholly owned subsidiary and the primary mortgage unit of HSBC Bank USA, N.A.

16.      Defendant HSBC BANK USA, N.A. is believed to be a Virginia corporation with its principal place of business in Buffalo, New York. HSBC Bank is the principal subsidiary of HSBC USA, Inc., an indirect, wholly owned subsidiary of HSBC North America Holdings, Inc., one of the nation's largest bank holding companies by assets. HSBC Bank is the named insured on the force-placed insurance policies.

17.     Defendant HSBC FINANCE CORPORATION, through its subsidiaries, owns and services a portfolio of residential real estate loans. HSBC Finance Corp. is a subsidiary of HSBC North America Holdings, Inc. and is headquartered in a suburb of Chicago, Illinois.

18.     Defendant BENEFICIAL COMPANY, LLC was formerly known as Beneficial Corporation and operates as a subsidiary of HSBC Finance Corp. Beneficial Company LLC is headquartered in a suburb of Chicago, Illinois.

19.     Defendant BENEFICIAL FINANCIAL I, INC. is a mortgage lender and operates as a subsidiary of HSBC Finance Corp.   Beneficial Financial I is headquartered in Irvine, California.

20.     Defendant HFC COMPANY LLC was formerly known as Household Group, Inc. and operates as a subsidiary of HSBC Finance Corp.   HFC Company LLC is headquartered in a suburb of Chicago, Illinois.

21.     Defendant HSBC CONSUMER LENDING (USA), INC. is a subsidiary of Defendant HSBC Finance Corp. headquartered in a suburb of Chicago, Illinois.

22.     Defendant HSBC MORTGAGE SERVICES, INC. was formerly known as Household Financial Services, Inc., and provides mortgage services and various financial services to its mortgage holders.   HSBC Mortgage Services operates as a subsidiary of Defendant HSBC Finance Corp., and is headquartered in Fort Mill, South Carolina.

23.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant's business strategy "is to pursue long term growth in lender placed homeowner's insurance []."  Assurant Form 10-K for the fiscal year ending December 31, 2011 at 5.

24.     Upon information and belief, Assurant participates in the force-placed insurance market through its trade name, Assurant Specialty Property. Assurant also often allows its subsidiaries (including American Security and Voyager) to operate their force-placed insurance business under the same trade name. "The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through (Assurant Specialty Property's) lender placed program." *Id.*

25.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware

corporation and an indirect subsidiary of Assurant, Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia. American Security often operates under the trade name Assurant Specialty Property. American Security contracts with the lenders whereby it acts as a force-placed insurance vendor. Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

26.     Upon information and belief, American Security passes much of its profits from force-placed insurance to its corporate parent Assurant.

27.     Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and a wholly owned subsidiary of Defendant American Security Insurance Company. SGIC's ultimate parent is Defendant Assurant, Inc.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

29.     Plaintiff is a citizen of the State of Florida. Defendants are citizens of various other states but are registered to do business in the aforementioned states. The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

30.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market

through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

31.     This Court has subject-matter jurisdiction over Plaintiff's Truth in Lending Act claim pursuant to 15 U.S.C. § 1640.  This Court also has supplemental subject-matter jurisdiction over Plaintiff's state law claims pursuant 28 U.S.C. § 1367.

32.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

33.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiff resided in the Southern District of Florida and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

34.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

35.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements used by most major lenders include a provision requiring the borrower to maintain hazard insurance coverage

on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

36.    What is unknown to borrowers and not disclosed in the mortgage agreements is that lenders and loan servicers have exclusive arrangements with certain insurers to manipulate the force-placed insurance market and artificially inflate premiums.  The premiums are inflated to provide lenders and servicers with kickbacks disguised as "commissions" (usually paid to an affiliate), or provide the lender or servicer (through an affiliate) with lucrative reinsurance arrangements as well as to include unmerited charges.  The borrower is then forced to pay the inflated premiums.

## The Force-Placed Insurance Scheme

37.    The scheme works as follows.   The HSBC Defendants purchase master or "umbrella" insurance policies that cover their entire portfolio of mortgage loans.  In exchange, Assurant, ASIC, or SGIC obtains the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  Assurant, ASIC, and/or SGIC monitors the HSBC Defendants' loan portfolio for lapses in borrowers' insurance coverage.   Once a lapse is identified, the insurer, through the force-placed insurance vendor, sends notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued. If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

38.    No individualized underwriting ever takes place for the force-placed coverage. Rather, the HSBC Defendants require or at least permit the insurer to automatically issue these

policies when a borrower's "voluntary" insurance coverage is not maintained.  In many instances, the insurance lapse is not discovered for months or even years after the fact.  Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the past premiums charged to the borrower.

39.     Once coverage is forced on the property, the HSBC Defendants charge the borrower for the insurance premiums.  The premium amount is automatically deducted from the borrower's mortgage escrow account, or added to the balance of the borrower's loan.[8]

40.      The lender or servicer then pays the premium to the insurer who then kicks back a set percentage of the premium to the mortgage lender's or servicer's affiliate as a "commission."  The affiliate then shares a percentage of that payment with the lender or servicer, sometimes in the form of "soft dollar" credits.

41.     The money paid back to the lender or servicer's affiliate is not given in exchange for any services provided by the affiliate; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickback as legitimate, the insurer discloses to the borrower that the affiliate may receive a "commission" or "compensation" for helping the lender to procure a force-placed policy.  In reality, however, no work is ever done by the affiliate to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.

42.     Under this highly profitable force-placed insurance scheme, lenders and servicers are incentivized to purchase and force-place a highly priced force-placed insurance policy on a borrower's property because the higher the cost of the insurance policy, the higher the kickback.

43.     The companies providing force-placed insurance to lenders and servicers also

---

[8] On some occasions when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

enter into agreements for the insurer to provide servicing activities on the entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance.  However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire loan portfolio.

44.     In addition, force-placed insurance providers enter into essentially riskless "captive reinsurance arrangements" with lenders and their affiliates to "reinsure" the property insurance force-placed on borrower.  For example, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries, including those, as hereinabove alleged, for whom Defendants produce force-placed insurance policies, has acknowledged that its force-placed insurance division "write[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients."  *See* Assurant, Inc. Annual Report (Form 100K), at 81 (February 25, 2010).  A recent *American Banker* article detailed this reinsurance problem with respect to JP Morgan Chase Bank:

> JPMorgan and other mortgage servicers' reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS.
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance

> may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns. The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, (May 18, 2012), available at http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

45.    The HSBC Defendants may also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

46.    Ultimately it is the unsuspecting borrower who suffers the consequences of these unconscionable practices.[9]

47.    Defendant Assurant and its subsidiaries, ASIC and SGIC, provide the HSBC Defendants with subsidized mortgage portfolio monitoring and force-placed insurance.  Upon information and belief, the HSBC Defendants receive money from this arrangement through captive reinsurance and/or kickback arrangements with HSBC affiliates.

---

[9] Furthermore, when the cost of the high-priced premium is added by the Defendants to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

**Plaintiff Darlene Diaz**

48.     On July 21, 2006, Plaintiff Darlene Diaz obtained a loan through Southstar

Funding, LLC which was secured by a mortgage on real property located in Florida.

49.     On March 29, 2012, Ms. Diaz's mortgage was assigned to the HSBC Defendants.

50.     Upon information and belief, Mr. Diaz's mortgage is currently serviced by the

HSBC Defendants.

51.     Ms. Diaz's mortgage agreement provides as follows:

> **5.  Property Insurance.**  Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by fire,
> hazards included within the term "extended coverage," and any other
> hazards, including, but not limited to, earthquakes and floods, for which
> the Lender requires insurance.  The insurance shall be maintained in the
> amounts … and for the periods that Lender requires.
>
> ***
>
> If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and Borrower's
> expense.  Lender is under no obligation to purchase any particular type or
> amount of coverage.  Therefore, such coverage shall cover Lender, but
> might or might not protect Borrower … against any risk, hazard or
> liability and might provide greater or lesser coverage than was previously
> in effect.  Borrower acknowledges that the cost of the insurance coverage
> so obtained might significantly exceed the cost of insurance that Borrower
> could have obtained.

52.     Plaintiff Diaz maintained property insurance on the property through a carrier she

selected and that policy was cancelled in approximately July 2011.

53.     In July 2011, Plaintiff Diaz was force placed insurance through American

Security.  Another policy was forced placed in July 2012.

54.     The annual premium for the force-placed policies, which the HSBC Defendants

maintain she continues to owe, were way in excess of that which could be obtained in the open

market.

55.     The premiums were inflated as they included costs for the kickbacks and

unearned commissions, the offset of administrative costs performed by the vendor, and/or a captive reinsurance arrangement.

56.     There is no material difference between these Defendants' actions and practices directed to Ms. Diaz and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.     Class Definitions

57.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiff seeks to represent the following class:

> All borrowers in the United States who, within the Class Period, were charged by the HSBC Defendants and/or their respective subsidiaries and affiliates as insureds or additional insureds under a hazard LPI Policy.  The following people are excluded from the Settlement Class:  (a) individuals who are or were during the Class Period officers or directors of the Defendants or any of their respective subsidiaries or affiliates; (b) any justice, judge or magistrate judge of the United States or any State, their spouses and persons within the third degree of relationship to either of them, or the spouses of such persons; and (c) borrowers whose hazard LPI Policy was cancelled in its entirety such that any premiums charged and/or collected were fully refunded or credited to the borrower.

58.     Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

59.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.     Numerosity

60.     The proposed class is so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in

the state of Florida, as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

### C.    Commonality

61.    There are questions of law and fact that are common to all Plaintiff's and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

    a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

    b.  Whether the HSBC Defendants breached the mortgage contracts with Plaintiff and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiff and the Class for servicing their loans;

    c.  Whether Defendants have been unjustly enriched at the expense of the Plaintiff and the Class;

    d.  Whether the HSBC Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated insurance premiums being charged to Plaintiff and the Class;

    e.  Whether the HSBC Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment to Plaintiff and the Class;

f.  Whether HSBC affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g.  Whether the premiums charged are inflated to include kickbacks and unwarranted "commissions;"

h.  Whether the premiums charged are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiff and the Class under the terms of their mortgages;

i.  Whether the premiums charged are inflated to include the cost of a captive reinsurance arrangement;

j.  Whether the HSBC Defendants violated TILA by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.  Whether the HSBC Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.  Whether the HSBC Defendants violated the anti-tying provisions of the federal Bank Company Holding Act by tying their agreement to purchase insurance on behalf of class members, and their continuing extensions of credit, on class members agreeing that they could purchase insurance through their affiliate;

m.  Whether Assurant and ASIC intentionally and unjustifiably interfered with the Plaintiff's and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

n.  Whether HSBC Mortgage, by its conduct, violated the Florida Deceptive and Unfair Trade Practices Act;

o.  Whether Plaintiff and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.     Typicality**

62.    Plaintiff is a member the Class she seeks to represent.  Plaintiff's claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will

continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

### E.    Adequacy of Representation

63.    Plaintiff is an adequate representative of the class she seeks to represent and will fairly and adequately protect the interests of that class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiff and the unnamed class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

64.    To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.    Requirements of Fed. R. Civ. P. 23(b)(3)

65.    The questions of law or fact common to Plaintiff's and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

66.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

67.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

### G.      Superiority

68.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

### H.      Requirements of Fed. R. Civ. P. 23(b)(1) & (2)

69.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

70.    Defendants have acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
### (against HSBC Mortgage Corp. and HSBC Bank USA)

71.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further allege as follows.

72.     Plaintiff and all similarly situated class members have mortgages that are owned and/or serviced by the HSBC Defendants.

73.     Plaintiff's and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by the HSBC Defendants.   The force-placed provision from Plaintiff's mortgage agreement is set forth above in paragraph 51.

74.     Plaintiff's mortgage agreement requires that she maintain insurance on her property and provides that if she fails to do so, then the lender may obtain insurance coverage to protect its interest in the properties, "force place" the coverage, and charge the borrower the cost.

75.     The HSBC Defendants charge borrowers premiums that include unearned "commissions" or kickbacks to them or their affiliates, reinsurance premiums, as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting the HSBC Defendants' rights or risk in the collateral for borrowers' mortgage loans.  The HSBC Defendants breached the mortgage agreements by, among other things, charging Plaintiff and class members the amounts beyond the actual cost of coverage.

76.     The HSBC Defendants have also breached Plaintiff's and the class members' mortgage agreements by charging Plaintiff and the class for excess and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect the HSBC Defendants' rights in their collateral or cover their risk.

77.     Plaintiff and the Class members have suffered damages as a result of the HSBC Defendants' breaches of contract.

**WHEREFORE**, Plaintiff, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the HSBC Defendants' breach of contract, as well as injunctive relief preventing it from further violating the terms of the mortgages. Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – (against the HSBC Defendants)

78.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

79.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

80.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

81.     Plaintiff's and the Class members' mortgage contracts allow the mortgage servicer to force place an insurance policy on the borrower's property in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

82.     The HSBC Defendants have substantial discretion in force placing insurance coverage. They are permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate a price for the coverage they procure. The servicers have

an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.  Plaintiff does not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

83.     The HSBC Defendants breached the implied covenant of good faith and fair dealing by, among other things:

(a)   Manipulating the force-placed insurance market by selecting insurers (here, Assurant and its affiliates) that will artificially inflate premiums to include kickbacks to the HSBC Defendants or an affiliate and issue excess insurance coverage not necessary to cover the HSBC Defendants' risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

(b)   Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize their own profits;

(c)   Assessing inflated and unnecessary insurance policy premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

(d)   Collecting a percentage or allowing their affiliates to collect a percentage of whatever premiums are charged to Plaintiff and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)   Charging Plaintiff and the Class for commissions when the insurance is prearranged and no commission is due;

(f)   Charging Plaintiff and the Class an inflated premium due to the captive reinsurance arrangement;

(g)   Charging Plaintiff and the Class for having the vendor perform their obligation of administering its mortgage portfolio which is not chargeable to Plaintiff or the Class;

(h)   Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements; and

(i)   Force placing insurance coverage in excess of what is required to cover the

lender's interest in the property, or the balance owed on the loan.

84.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiff also seeks compensatory damages resulting from the HSBC Defendants' breaches of their duties.  Plaintiff further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (against the HSBC Defendants)[10]

85.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

86.     The HSBC Defendants received benefits from Plaintiff and Class members in the form of inflated insurance premiums related to force-placed insurance policies, unwarranted kickbacks and commissions, captive reinsurance arrangements, and subsidized loan servicing costs.

87.     These Defendants entered into an agreement whereby the insurance vendor— here, Assurant's subsidiaries, ASIC and SGIC—would provide force-placed insurance policies to the HSBC Defendants for the portfolio of loans monitored on behalf of the HSBC Defendants. The HSBC Defendants would then charge Plaintiff and the Class premiums that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed

---

[10] Plaintiff pleads this unjust enrichment claim against the HSBC Defendants in the alternative to her contractual claims against them.

policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

88.     These Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

89.     Assurant and its aforementioned subsidiary paid and collected significant monies in premiums, kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to the HSBC Defendants in order to be able to exclusively provide force-placed insurance policies. Assurant, SGIC, and/or ASIC were mere conduits for the delivery of the kickbacks, "commissions," and other charges to the HSBC Defendants.

90.     These payments directly benefitted the HSBC Defendants and were taken to the detriment of the borrower.  The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

91.     Further, the HSBC Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, and/or "soft-dollar" credits.

92.     As a result, Plaintiff and the Class have conferred a benefit on the HSBC Defendants.

93.     These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

94.     These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class Members, demand an award against the HSBC Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## UNJUST ENRICHMENT
## (against Assurant, ASIC, and SGIC)

95.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

96.     The Assurant Defendants received from Plaintiff and Class members benefits in the form of insurance premiums related to force-placed insurance policies.

97.     The Assurant Defendants paid significant monies to the HSBC Defendants in kickbacks, commissions, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).   Commissions or kickbacks were paid directly to the HSBC Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

98.     The Assurant Defendants also collected premiums on force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

99.     On information and belief, the Assurant Defendants deducted the excess premiums directly from borrowers' escrow accounts.  In the alternative, the HSBC Defendants

were mere conduits for the delivery of insurance premiums to the Assurant Defendants.

100.     As a result, Plaintiff and the Class have conferred a benefit on the Assurant Defendants.

101.     These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

102.     These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff, on behalf of herself and all similarly situated Class Members, demand an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

<u>**COUNT V**</u>

<u>**VIOLATIONS OF THE TRUTH IN LENDING ACT 15 U.S.C. § 1601 *et seq.***</u>
<u>**(against the HSBC Defendants)**</u>

103.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

104.     Plaintiff's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, ("TILA"), and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

105.     The HSBC Defendants are "creditors" as defined by TILA because they owned Plaintiff's mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the HSBC Defendants were creditors.

106.    Pursuant to TILA, the HSBC Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

107.    The HSBC Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when they (i) added force-placed insurance to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving the HSBC Defendants and/or their affiliates as a result of the purchase of force-placed insurance.

108.    When the HSBC Defendants changed the terms of Plaintiff's mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of the HSBC Defendants' interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, the HSBC Defendants were then required to provide a new set of disclosures showing the amount of the insurance premiums (i.e. finance charges) and all components thereof.  On information and belief, the HSBC Defendants increased the principal amount under Plaintiff's mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

109.    The HSBC Defendants adversely changed the terms of Plaintiff's and Class Members' loans after origination in order to allow an HSBC affiliate to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  The HSBC Defendants have never disclosed to their borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

110.    The HSBC Defendants also violated TILA by adversely changing the terms of Plaintiff's loans after origination by requiring and threatening to force-place more insurance than

necessary to protect their interest in the property securing the mortgages.

111.   Acts constituting violations of TILA occurred within one year prior to the filing of this Complaint, or are subject to equitable tolling because the HSBC Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among HSBC and its affiliates and was concealed from borrowers.

112.   Plaintiff and Class Members have been injured and have suffered a monetary loss arising from the HSBC Defendants' violations of TILA.

113.   As a result of the HSBC Defendants' TILA violations, Plaintiff and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of the HSBC Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

114.   Plaintiff and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the HSBC Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff, on behalf of all Class members similarly situated, seek a judgment in their favor against the HSBC Defendants awarding actual damages and a penalty of $500,000.00 or 1% of the HSBC Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by HSBC Defendants, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VI

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against Assurant, ASIC, and SGIC)

115.   Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

116.   Plaintiff and the Class members have advantageous business and contractual relationships with the HSBC Defendants pursuant to their mortgage contracts.  Plaintiff and the

Class have legal rights under these mortgage contracts.  For example, Plaintiff and the Class have a right not to be charged inflated premiums in bad faith for forced-place insurance.

117.    Assurant and its subsidiaries, ASIC and SGIC, have knowledge of the mortgage contracts and the advantageous business and contractual relationship between Plaintiff and the HSBC Defendants.  Assurant , ASIC, and SGIC are not parties to the mortgage contracts and are not third-party beneficiaries of the mortgage contracts.  Further, these Defendants do not have any beneficial or economic interest in the mortgage contracts.

118.    Assurant, ASIC, and SGIC intentionally and unjustifiably interfered with Plaintiff's and the Class's rights under the mortgage contracts, as described above by, *inter alia*, entering into an exclusive relationship with the HSBC Defendants and their affiliate whereby they provide compensation (kickbacks, reinsurance, and low cost services) to the HSBC Defendants in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiff and the Class.

119.    Plaintiff and the Class have been damaged as a result of Assurant's, SGIC's, and ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiff and all Class members similarly situated seek a judgment in their favor against Assurant, ASIC, and SGIC for the actual damages suffered by them as a result of their tortious interference.  Plaintiff also seeks all costs of litigating this action including attorney's fees.

## <u>COUNT VII</u>

### <u>BREACH OF FIDUCIARY DUTY</u><br><u>(against the HSBC Defendants)</u>

120.    Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth

herein and further alleges as follows.

121.     The HSBC Defendants hold funds in escrow on behalf of borrowers whose mortgages they own/service.  These funds are designated for the purpose of paying insurance premiums when due, and any excess funds are to be returned to Plaintiff and members of the Class under the terms of the mortgage agreements.

122.     A fiduciary relationship exists between Plaintiff and the HSBC Defendants because the HSBC Defendants have received a greater economic benefit than from a typical escrow transaction. Specifically, the Plaintiff's and the lender's debtor-creditor relationship transformed into a fiduciary relationship when the HSBC Defendants took it upon themselves to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed hazard insurance premiums.  The HSBC Defendants violated their fiduciary duties when they began receiving unlawful kickbacks or other compensation under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgage.

123.     The HSBC Defendants breached their fiduciary duties to Plaintiff and other members of the proposed class by (1) not acting in their best interest when they profited from force-placed insurance policies that were purchased using escrow funds they held for the benefit of Plaintiff and class members at the expense of Plaintiff and class members, and (2) not disclosing the kickback scheme to Plaintiff and class members.

124.     These actions were undertaken by the HSBC Defendants in bad faith for their own benefit and were not intended to benefit Plaintiff or other proposed class members.

125.     As a direct result of the HSBC Defendants' actions and subversion of Plaintiff's interest to their own interests in reaping extravagant and outrageous fees, Plaintiff and all others

similarly situated have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiff and the proposed class are entitled to damages for the HSBC Defendants' breaches of their fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiff and the class are entitled to punitive damages because the HSBC Defendants acted in bad faith in deliberate or reckless disregard of their rights and their obligation to hold their escrow funds in trust.

**COUNT VIII**

**VIOLATION OF THE FLORIDA
DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(against HSBC Mortgage)**

126.     Plaintiff re-alleges and incorporates paragraphs 1-56 above as if fully set forth herein and further alleges as follows.

127.     FDUTPA, section 501.201, *et seq.*, Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

128.     Plaintiff and the class are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

129.     HSBC Mortgage has engaged in, and continues to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

130.     The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by Plaintiff and the Class, which in turn were intended to generate unlawful or unfair compensation for HSBC Mortgage.

131.    Specifically, HSBC Mortgage had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated premiums for force-placed insurance policies, charge those amounts to Plaintiff and the Class, and then receive compensation through either kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

132.    HSBC Mortgage's conduct of charging an inflated premium for their force-placed insurance to Plaintiff and members of the Class violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

133.    HSBC Mortgage is a mortgage servicer and not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, HSBC Mortgage is not a bank or savings and loan association regulated by federal agencies.

134.    The above-named Plaintiff and the Class sustained damages as a direct and proximate result of HSBC Mortgage's unfair and unconscionable practices.  Section 501.211(2), Florida Statutes provides Plaintiff and the Class a private right of action against HSBC Mortgage and entitles them to recover their actual damages, plus attorneys' fees and costs.

135.    Plaintiff and the Class have suffered and will continue to suffer irreparable harm if HSBC Mortgage continues to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff, on behalf of themselves and the Class, demand judgment against HSBC Mortgage for compensatory damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and all similarly situated individuals demand judgment against Defendants as follows:

(1)　Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and her counsel to be representatives of the Class;

(2)　Enjoining Defendants from continuing the acts and practices described above;

(3)　Awarding damages sustained by Plaintiff and the Class as a result of Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre- and post-judgment interest;

(4)　Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiff and the Class, together with pre- and post-judgment interest;

(5)　Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(6)　Awarding damages sustained by Plaintiff and the Class as a result of the Assurant Defendants' tortious interference;

(7)　Awarding actual damages and a penalty of $500,000.00 or 1% of the HSBC Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(8)　Awarding Plaintiff and the Class damages, injunctive relief, declaratory relief,

attorneys' fees, and costs under FDUTPA; and

(9)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.

Respectfully submitted this 7th day of March, 2014.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiff* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiff* | |