**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-cv-21104-MORENO/GARBER**

DARLENE DIAZ, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

HSBC BANK USA, N.A., *et al.*

      Defendants.

_____/

---

**OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT BY
DEBRA KIRKTINDOLL, TIMOTHY BROOKS, JEAN FRANCOIS AND PATRICIA
DEHAERNE, MARK AND TAMMY WAKEFIELD, CHRISTOPHER MAXWELL,
MATT AND GLADYS WOODEN, AND LAQUENTA AND SERGIO MONTANEZ**

---

## I.      INFORMATION REQUIRED BY CLASS ACTION NOTICE

## A.      CASE NAME AND NUMBER:

The name of the lawsuit is in the caption to this document.

## B.      NAME, ADDRESS, AND TELEPHONE NUMBER OF OBJECTOR:

Name:                   Debra Kirktindoll
Address:                613 Hillstock Court, Patterson, CA  95363
Telephone Number:       (209) 892- [Redacted and will be provided by counsel below if requested]

Name:                   Timothy Brooks
Address:                1842 Huntingdon Avenue, Dallas, TX  75203
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Jean Francois DeHaerne
Address:                304 Carolina Court, Saint Marys, GA  31558
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Patricia DeHaerne
Address:                304 Carolina Court, Saint Marys, GA  31558
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Mark Wakefield
Address:                16015 Steed Road, Mounds, OK  74047
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Tammy Wakefield
Address:                16015 Steed Road, Mounds, OK  74047
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Christopher Maxwell
Address:                774 Piedmont Avenue, NE, Apt. 6, Atlanta, GA  30308
Telephone Number:       [Redacted and will be provided by counsel below if requested]

Name:                   Matt Wooden
Address:                1511 Forest Cove Drive, Chesapeake, VA  23323
Telephone Number:       (757) 558- [Redacted and will be provided by counsel below if requested]

Name:                   Gladys Wooden
Address:                1511 Forest Cove Drive, Chesapeake, VA  23323
Telephone Number:       (757) 558- [Redacted and will be provided by counsel below if requested]

Name:     LaQuenta Montanez
Address:    5946 Colgate Street, Philadelphia, PA  19120
Telephone Number: (215) 941- [Redacted and will be provided by counsel below if requested]

Name:     Sergio Montanez
Address:    5946 Colgate Street, Philadelphia, PA  19120
Telephone Number: (215) 941- [Redacted and will be provided by counsel below if requested]

## C. BASIS FOR OBJECTION:

Debra Kirktindoll, Timothy Brooks, Jean Francois and Patricia Dehaerne, Mark and Tammy Wakefield, Christopher Maxwell, Matt and Gladys Wooden, LaQuenta and Sergio Montanez ("Objectors") are putative class members whose claims will be released by the settlement presented for final approval in the above captioned matter.  They are also named plaintiffs and/or putative class members in a separate, earlier-filed action challenging the *Lopez/Diaz* defendants'[1] and/or other HSBC affiliates' abusive force-placed insurance practices, captioned *Montanez, et al. v. HSBC Mortg. Corp. (USA), et al.*, No. 11-cv-0474 (E.D. Pa.) ("*Montanez* Action").  Objectors submit this objection to the proposed settlement for the reasons set forth in detail below.

## D. STATE WHETHER OBJECTORS INTEND TO APPEAR AT FINAL APPROVAL:

Counsel intends to appear at the Final Approval Hearing.

Represented by Counsel: Yes

---

[1] The *Lopez/Diaz* Defendants refers to HSBC Bank USA, N.A., HSBC Mortgage Corporation, HSBC Finance Corp., Beneficial Company, LLC, Beneficial I, Inc., HFC Company, LLC, HSBC Consumer Lending (USA), Inc., HSBC Mortgage Services, Inc. ("HSBC Defendants"),Assurant, Inc. and American Security Insurance Co., Standard Guaranty Insurance Company ("Assurant"). The HSBC Defendants and Assurant also collectively referred to as the "Defendants."

Counsel Contact Information:

| **KESSLER TOPAZ** | **ARONOVITZ LAW** | **LOWEY DANNENBERG** |
|---|---|---|
| **MELTZER & CHECK, LLP** | Tod Aronovitz | **COHEN & HART, P.C.** |
| Peter A. Muhic | One Biscayne Tower, | Barbara Hart |
| Edward W. Ciolko | Suite 2630 | Jeanne D'Esposito |
| 280 King of Prussia Road | 2 South Biscayne Boulevard | Scott V. Papp |
| Radnor, Pennsylvania  19087 | Miami, FL  33131 | David C. Harrison |
| Telephone: (610) 667-7706 | Telephone: (305) 372-2772 | One North Broadway, Suite 509 |
| Facsimile: (610) 667-7056 | Facsimile: (305) 397-1886 | White Plains, NY  10601-2301 |
| Email: pmuhic@ktmc.com | Email: ta@aronovitzlaw.com | Telephone: (914) 997-0500 |
| Email: eciolko@ktmc.com | | Facsimile: (914) 997-0035 |
| | | Email: bhart@lowey.com |
| | | Email: jdesposito@lowey.com |
| | | Email: spapp@lowey.com |
| | | Email: dharrison@lowey.com |

## II.    SUMMARY OF OBJECTIONS

The Settlement presented by Plaintiffs for final approval is unfair and unreasonable and was irredeemably tainted by conflict involving both the putative Class representative and Class Counsel.[2]  The sole named plaintiff in this action from March 28, 2013, the date the initial complaint was filed (ECF No.1), until December 5, 2013 (ECF No. 83), was Javier Lopez, who at all times material hereto was an attorney with the principal law firm controlling the litigation. Defendants were aware of this conflict and used it to their advantage to extract settlement terms unfair to the Class.  This inadequate representation by the Class Representative and Class Counsel deprives the Class of due process.

The parties represent that the proposed Settlement will provide $32 million dollars in monetary relief plus substantial injunctive relief, but these assertions are misleading. The Settlement does not establish a common fund.  Any payments to Class Members are strictly on a "claims-made" basis with no guaranteed minimum payout to the Class.  Further, after attorneys'

---

[2] Class Counsel refers to Kozyak Tropin and Throckmorton, P.A. ("Kozyak Tropin"), Podhurst Orseck, P.A., and Harke, Clasby & Bushman, LLP.

fees are deducted, there is a maximum of $22 million made available to the Class. Class Members will receive 13% or 6% of the total LPI charges imposed on them only if they submit a claim form and only if there is sufficient money available under the cap.[3]

Given the need for all Class members to decipher a confusing Notice and then complete and return a claim form in order to recover any money under this Settlement, only a fraction of the affected homeowners will receive any monetary recovery. Indeed, the proposed Class Notice and claims procedure is so biased in favor of Defendants that the only guarantee with this settlement is that the Defendants will erase hundreds of millions of dollars of potential liability in exchange for paying $10 million in attorneys' fees to Class Counsel.

In addition, the injunctive relief provides *de minimis* value because it is comprised essentially of terms and conditions that already have been imposed upon Defendants by numerous government and/or regulatory actions. In support of their Objections to the proposed Settlement, Objectors submit the Expert Report of Adam J. Levitin (the "Levitin Report", attached hereto as Exhibit A) as well as a Declaration by Rebecca Walzak (the "Walzak Report," attached hereto as Exhibit B). Professor Levitin is a recognized expert in the area of mortgage loan servicing and is a Professor of Law at Georgetown University Law Center in Washington, D.C. He has testified extensively before Congress regarding financial regulatory issues, specifically including housing finance and, *inter alia*, frequently counsels members of Congress, the Consumer Financial Protection Bureau and the Federal Reserve on financial regulation and housing finance. Professor Levitin's Report rebuts the Defendants' assertion that a claims-made settlement structure is necessary and further shows that the injunctive relief promised by the proposed Settlement is inconsequential as the Parties "merely recreate pre-existing legal duties

---

[3] The parties represent that there are 252,464 Class Members and that there were $425 million in charges to Class Members, *see* Jt. Decl. ECF No. 156-2, ¶ 39.

and functional market requirements."  Levitin Report at ¶ 24.  *See also* Final Approval MOL at 1-2, 14-17; Jt. Declaration, ECF No. 156-2, ¶¶ 16-19; Notice of Settlement ECF No. 156-3 ¶ 7; Levitin Report at Section I.

Ms. Walzak has 35 years of experience in the mortgage lending industry, including experience in the escrow management process, advising management of regulatory requirements and working with technology staff to ensure all requirements were maintained through the organization's processes.  Ms. Walzak explains why a claims-paid settlement is feasible here. *See* Walzak Report.

Further, the Class Notice and Claim Form are materially deficient.  To begin, the Notices and Forms are confusing.  Among other things, they:  (1) require Class members to know everyone who was listed as an insured or additional insured on the force-placed policies and to have all such persons complete the Claim Form;  (2) represent that certain borrowers (such as those who filed Chapter 7 bankruptcy or had mortgage debt "compromised") cannot recover any money although they release all of their claims under the Settlement; (3) require Class members to know information about the timing of their payments and adjustment to escrow accounts that they likely will not know without locating old documents.

In light of all of these deficiencies, this Court should deny final approval of the Settlement.  Objectors are willing to engage in mediation with the *Lopez/Diaz* Parties to attempt to restructure and improve the terms and conditions of settlement to insure that it is fair, reasonable and appropriate for the proposed Settlement Class.

## A.    SPECIFIC OBJECTIONS

Class Counsel filed suit with a member of Kozyak Tropin serving as the sole named plaintiff even though Mr. Lopez could not adequately represent the proposed Class and it was highly improper to name him as a proposed class representative.  *See, e.g.*, *London v. Wal-Mart*

*Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. Fla. 2003).  This conflict and the bargaining leverage it afforded the defendants resulted in a Settlement that favors Defendants and Class Counsel over the Settlement Class.  *See, e.g.*, *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014)("*Pella*")  ("From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted towards attorneys' fees.").  Because of the conflicted position of Class Counsel and Mr. Lopez, the Settlement they negotiated unfairly sacrifices the interests of Objectors and the Class, limiting Defendants' exposure in return for a guaranteed award of attorneys' fees while guaranteeing nothing to Objectors and the Class.[4]

### 1.   Class Representative and Class Counsel's Inadequacy Denied Objectors and the Class Due Process

Adequate representation is a fundamental requirement in any class action matter as it implicates Constitutional issues of due process and is one of the requirements that a District Court must find before it can certify a class pursuant to Fed. R. Civ. P. 23.  Plaintiff Javier Lopez's presence as a named plaintiff and putative Class representative in this case corrupts the entire proceedings.

As a practical matter, Objectors will suffer prejudice if they are denied their Constitutional right to due process, which can only be obtained in a class action when there is adequate representation.  *Matsushita Elec. Indus. Co. Ltd. v. Epstein*, 516 U.S. 367, 397

---

[4] *See, e.g.*, *Pella*, 753 F.3d at 724, noting that a defendant is at an advantage and can "stiffen[] its terms" when negotiating with plaintiff's counsel it knows is in a box due to conflicts of interest. *Pella* overturned the approval of a settlement where almost "every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for was present," and collecting cases identifying those danger signs.

(1996)(Ginsburg Concurrence).[5]  In *Matsushita*, Justice Ginsburg wrote a concurring opinion for the sole purpose of "emphasizing" the paramount importance of adequate representation, stating that "in the class action setting, adequate representation is among the due process ingredients that must be supplied if the judgment is to bind class members." *Id.* at 388 (Ginsburg Concurrence). Plaintiff Lopez's and Class Counsel's conflict underlies each and every decision made by the Plaintiff and Class Counsel and resulted in a demonstrably infirm Settlement that "sold-out" the Settlement Class and denied them Constitutional due process.

### 2.   The Settlement Was the Result of Fraud and Collusion

Class Counsel erroneously assert that the "vigor" with which they prosecuted the case satisfies Rule 23's requirement that a settlement not be the result of fraud or collusion.  Jt. Declaration, ECF No. 156-2, Section IV. A.  It does not.  Setting aside the fact that neither the final approval papers submitted by Class Counsel nor the record provide any meaningful evidence of "vigor," the vigor with which Class Counsel prosecuted the case does not render either Mr. Lopez or Class Counsel adequate nor does it rehabilitate the Settlement.  Defendants' knowledge that Mr. Lopez was an attorney at Kozyak Tropin and that this fact had not been disclosed properly to the Court, or addressed in any meaningful way, enabled Defendants to use this information to extract a more favorable settlement from Plaintiff.  That is, Defendants exploited the conflict to extract a settlement unfair to the Class. *See Pella*, 753 F.3d at 724.  Only

---

[5] *Matsushita* involved a state court settlement in a class action with a release that would release claims that were pending in a parallel federal class action.  At issue was whether a federal court could withhold full faith and credit from a state court judgment approving a class action settlement.  The Supreme Court held that where there is adequate representation, and the settlement is fair, class members could not re-litigate the same issues in a federal court.  516 U.S. at 378.  Thus, the adequacy of representation is of utmost importance where class members will be bound. *Id*. at 395.

after getting Plaintiff and Class Counsel to agree in principle to settle, did Defendants then agree to allow Plaintiff to add a new class representative for the settlement approval process.

**(a)      Putative Class Representative Javier Lopez Was Never an Adequate Class Representative**

Javier Lopez initiated this action on March 28, 2013.  ECF No. 1.  In the original complaint, Mr. Lopez asserted claims on behalf of "All borrowers in the United States who, within the Class Period, were charged by the HSBC Defendants and/or their respective subsidiaries and affiliates as insureds or additional insureds under a hazard LPI policy."[6]  Class Notice, ECF No. 156-3 ¶ 5.

Mr. Lopez, as an attorney – who subsequently was promoted to a partner of Kozyak Tropin – cannot serve as a class representative in the instant action.  This has long been the rule in the Eleventh Circuit.  *London*, 340 F.3d at 1255 (holding that a long-standing relationship between a class representative and class counsel renders a class representative inadequate.").[7]  As such, the Settlement before this Court is irredeemably tainted by Mr. Lopez's presence in the case.  *See, e.g.*, *London*, 340 F.3d at 1255 (holding "[i]n summary, because the personal and financial ties between [named class representative and class counsel] are very close, and because [counsel's] recovery will vastly exceed what any of the class members will receive, we conclude that London cannot fairly and adequately represent the class.")  The dangers of a conflict where

---

[6] The Settlement Agreement defined the Class Period as January 1, 2005 to the date of final approval.  ECF No. 101-1 ¶ 2.8.

[7] Notably, Assurant has previously argued strenuously that *even the possibility* of a conflict between the class representative and the absent class members" renders a class representative inadequate.  *See London v. Wal-Mart Stores, Inc*., Case No. 02-12254 (11th Cir.), Appellants' Reply Brief (Sept. 10, 2002) at 25.  Here, where Assurant escapes tremendous liability by way of the favorable settlement reached with the inadequate Class Representative and Counsel, it disingenuously ignores the conflict.

the Class Representative is motivated more by the Class Counsel's recovery of attorneys' fees than by the recovery to the Class members are on full display here. *See also Pella*, 753 F.3d at 722 (observing, in reversing the approval of a class action settlement obtained by conflicted counsel, "the impropriety of allowing [counsel's father-in-law] to serve as class representative as long as his son-in-law was counsel was palpable").

At all times throughout the litigation and through the mediation and date of the Parties' agreeing upon the material terms of settlement, named plaintiff Javier Lopez was an attorney employed by Class Counsel – and, in fact, was promoted to partner during the course of litigation.  There is no question that Mr. Lopez was the only named plaintiff and putative Class Representative at all times pertinent to the Settlement.

- Mr. Lopez was the only named plaintiff when he initiated this action on March 28, 2013.  ECF No. 1.

- He was the only named plaintiff when his firm moved, on October 25, 2013 (ECF No. 72), to be appointed, and subsequently was appointed, interim class counsel pursuant to FED. R. CIV. P. 23(g).  ECF No. 76.

- He was the only named plaintiff and class representative when the parties attended a mediation on November 21, 2013, and agreed to the principle terms of settlement (which included $10 million in attorneys' fees for Class Counsel).  ECF No. 101-2 ¶ 14.

- Defendants only agreed to the addition of Ms. Diaz as a named plaintiff and proposed Class representative in December 2013 after the Parties had agreed to the settlement in principle, at which time they filed their non-oppositions to Plaintiffs' Motion to Add a Class Representative.  ECF Nos. 81 & 82.

• Mr. Lopez remained the sole named plaintiff until December 5, 2013, when the District Court docketed a "Corrected" Class Action Complaint with the assent of the Defendants adding Darlene Diaz as an additional plaintiff.  ECF Nos. 81-83 and 89.

In light of the forgoing, Class Counsel's timeline of events is inaccurate and misleading. Jt. Declaration, ECF No. 156-2, at ¶¶ 10-11; Final Approval MOL, at 4.[8]  Class Counsel attempt to "fix" the conflict arising from Mr. Lopez's involvement by arguing that Ms. Diaz was the "real" plaintiff and her presence in the case made the agreed-to settlement somehow legitimate. It did not.  As current and prior pleadings in this case and in the *Montanez* case show, the date that Ms. Diaz was added to the case was ***after*** the parties had agreed to a settlement in principle that was negotiated by Class Counsel while Mr. Lopez was the sole class representative. *See* Declaration of Stanley F. Birch, Jr. (Ret.), ECF No. 101-2 ¶¶ 6, 14; ECF No. 101-2 ¶ 14; *Montanez v. HSBC Mort. Corp.*, No. 11-cv-4074 (E.D. Pa. Mar. 10, 2014), ECF No. 184; ECF No. 118-1 ¶ 5 (reflecting that the HSBC Defendants informed Objectors that they had reached a settlement in principle at the mediation and signed the MOU on December 5, 2013). As such, Ms. Diaz's addition does nothing to ameliorate the harm and impairment to Objectors' interests resulting from the inadequacy of both counsel and the class representative during litigation, mediation and settlement.  ECF No. 144.

The Eleventh Circuit has made very clear that when ***even one*** named plaintiff/class representative is deemed inadequate because he was an employee of class counsel, it could not certify a class due to the class representative's inadequacy.  *See Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1376 (11th Cir. 1984) ( finding that when one of three representatives was

---

[8] In these filings, Class Counsel omit any reference to the fact that the Settlement in principle was negotiated and reached in November, 2013, while Mr. Lopez was still the sole named plaintiff and before they had agreement from Defendants, or approval from the Court, to add Ms. Diaz.

inadequate, it is proper to conclude that class representatives are inadequate and deny class certification on that ground).  Here, even after Ms. Diaz became a named Plaintiff, Mr. Lopez's mere presence in the case continued to infect the case and renders the Settlement irreparably tainted.

> **(b)      Class Counsel's Relationship with Putative Class Representative Javier Lopez Renders them Inadequate Counsel and Is Another Independent Reason Why the Court Should Not Finally Approve the Settlement**

Class Counsel's relationship with Mr. Lopez and their conduct in pursuing this case with Mr. Lopez as the named representative makes them inadequate.  The controlling law in this Circuit provides that "attorneys who are partners or spouses of named plaintiffs, or who themselves are members of the class of plaintiffs should be subject to a per se rule of disqualification under Canon 9 and should not be permitted to serve as counsel for the class." *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (11th Cir. 1978).  The *Zylstra* Court reasoned, "An attorney whose fees will depend upon the outcome of the case and who is also a class member or closely related to a class member cannot serve the interests of the class with the same unswerving devotion as an attorney who has no interest other than representing the class members." *Id.*  The Sixth Circuit, agreeing with this Court, neatly summed up the reason for this near universally accepted proposition:

> If the interests of a class are to be fairly and adequately protected, if the courts and the public are to be free of manufactured litigation, and if proceedings are to be without cloud, the roles of Class Representative and of class attorney cannot be played by the same person.

*Turoff v. May Co.*, 531 F.2d 1357, 1360 (6th Cir. 1976).  Where counsel acts on interests that are of concern to it but inimical to those of they seek to represent in a class action, they simply are not adequate.  *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211,

216 (11th Cir. 1993) (reversing the denial of intervention, explaining, "[g]iven the fact that the parties in the litigation that allegedly represent the appellants' interests possess interests inimical to the appellants, we conclude that the existing parties to the lawsuit may not adequately represent the appellants") (internal citations omitted).

Put succinctly, "[a]dequacy of representation undoubtedly includes the requirement that class counsel be free of conflict with class members." *Hill v. Butterworth*, 170 F.R.D. 509, 517 (N.D. Fla. 1997). The Eleventh Circuit clearly concurs and has even expressly noted, regarding the perception that class lawyers do not have the class interests in mind when they bring a lawsuit, "that nothing has created as much 'cynicism at the bar' as the settlement negotiations in class actions and the 'accompanying maneuvering for fees.'" *Piambino v. Bailey*, 757 F.2d 1112, 1143 (11th Cir. 1985). Here, Class Counsel proceeded with this case with Mr. Lopez as their figurehead plaintiff, even though Class Counsel surely knew that doing so resulted in "'the presence of the … conflict [that] would create divided loyalties which would constitute inadequate representation.'" *Piambino*, 757 F.2d at 1145. The result is the flawed Settlement presented for approval here which cannot be approved.

> **(c)   Class Counsel's Lack of Candor to the Court Renders them Inadequate and the Settlement Correspondingly Objectionable**

The Court of Appeals for the Eleventh Circuit has often repeated, "Every lawyer is an officer of the court. And, in addition to his duty of diligently researching his client's case, he always has a duty of candor to the tribunal." *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994).[9]  As demonstrated herein, throughout the proceedings in this action, Class

---

[9] *See also Piambino*, 757 F.2d at 1145 (noting with disfavor that "lead Counsel have never confessed that they had an irreconcilable conflict); *Nat'l Air Traffic Controllers Ass'n v. Dental Plans, Inc.* 2006 WL 584760, at *4 (N.D. Ga. Mar. 10, 2006) (quoting *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) ("The appearance of divided loyalties includes both

Counsel has demonstrated a lack of candor with respect to their ability to serve as Class Counsel or interim Class Counsel, the adequacy of Mr. Lopez as a class representative and the date when the Parties agreed to a settlement in principle.

Class Counsel's misleading chronology of events leading to the settlement misstates facts. The chronology relating to the settlement is important as it confirms that Mr. Lopez was the sole named plaintiff at all times material to the Parties' agreement to settle in principle and is evidence of Class Counsel's and Plaintiff Lopez's inadequacy.  Further, the role of Mr. Lopez as class representative and his firm as Class Counsel precluded arm's length negotiations conducted by adequate representatives of the Class.

Further, Class Counsel repeatedly assert that the Class will receive a monetary benefit in the amount of $32 Million.  This is wrong. First, the Parties agreed to a Settlement Cap of $32 Million and attorneys' fees of $10 Million, thereby effectively limiting the amount available for distribution to the Class to $22 million (prior to accounting for further reductions due to administrative costs).  Second, and even more significant, the monetary value of payments to Class Members is in reality likely to be far less because of the unnecessary claims-made nature of the settlement as discussed herein.

**B.      Class Counsel and Putative Class Representative, Javier Lopez's Inadequacy Led to a Settlement that is Not Fair and Reasonable**

**1.      The Requirement for All Class Members to Submit Claims Forms is an Unnecessary and Unfair Impediment to Recovery**

The purported $32 million settlement amount is wholly illusory given the strict "claims-made" settlement structure and the absence of any common fund or guaranteed payments to ***any***

_____

differing and potential conflicting interests, not merely instances actually manifesting such conflict.").

members of the Settlement Classes.  The requirement for **all** Class Members to submit claims forms if they want to receive a monetary benefit is an unnecessary and unfair impediment to recovery and only serves to reduce the claims rate and reduce the Defendants' overall payout.

### (a)      There is No Justification for the Use of a Claim Form Here

There is no need for a claims-made settlement as the monetary payments to the Settlement Class are calculated from the amount of force-placed insurance premiums the Defendants **_charged_**.  Plaintiffs provide no adequate explanation for why a claims procedure is necessary in this case where the identity of all Class members is known, as well as their damages information.[10]   As is evident from the terms of the Settlement itself, Defendants have Net Premium information in their computerized account records which will be utilized by the Claims Administrator to determine the amount of each claiming Class Member's Settlement Payment. Settlement Agreement, ECF No. 156-1, ¶ 7.4.   *See also* Levitin Report at ¶¶ 56-63. Nevertheless, the Settlement Agreement mandates that each Class member go through the procedural hurdle of verifying information already known by Defendants and submitting a sworn claim form or else be barred from receiving a recovery.

Quite plainly, the information requested in the Claim Form is not necessary to identify the members of the Settlement Class or determine the amount each Class member is entitled to. While the Claim Form requires Class members to indicate whether they "paid" or "did not pay," "owed" or did not "owe" a portion of their force-placed insurance premium, not only is that information contained in Defendants' records (Levitin Report at ¶¶ 59-63), but the answer to the

---

[10] Moreover, HSBC maintains all the information needed to stay in compliance with the Real Estate Settlement Procedures Act § 3500.17(i), which states a "servicer must submit to the borrower an annual statement for each escrow account item within thirty days of the completion of the computation year" and such annual escrow statement must include "the amount paid from the account for taxes, <u>insurance premiums</u>, and other charges."  *Id*. (emphasis added).

question does not affect the amount each Class member is eligible to receive because any payments under the Settlement are calculated based on the amount *charged*. *See* Settlement Agreement ¶¶ 3.1.1 and 3.1.2. In fact, Class Counsel state: "all class members who submit a valid claim form will recover their respective percentage of the net premium charged regardless of whether the class members paid any portion of that premium to HSBC." Final Approval MOL at 16. The difference is that those Settlement Class members who mark the "paid" box will receive their refund in the form of a *check* for 13% of the charges for FPI. The Settlement Class members who mark "did not pay" will receive their Settlement refund in the form of *a check or a credit* for 6% of the charges for FPI at the HSBC Defendant's discretion. Final Approval MOL at 5. This claims process is merely a mechanism which limits Class participation and reduces Defendants' ultimate payout.

One of Class Counsel's main justifications for the claims process is that courts have allowed it in other cases in this District, particularly in *Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014). However, the *Saccoccio* settlement -- negotiated by the same Class Counsel -- is currently on appeal to the Eleventh Circuit for many of the same deficiencies as seen here. *See Varnes v. JPMorgan Chase Bank, N.A., et al*., No. 14-11085 (11th Cir.).

### (b)    The Parties Have All the Information Necessary to Structure a Claims-Paid Settlement

Class Counsel's submissions confirm that the information to be obtained from the Claim Form is unnecessary to refund amounts charged for force-placed insurance to the Settlement Class. Indeed, Class Counsel know that HSBC charged Class members $425 million in premiums. Jt. Decl. ECF No. 156-2 ¶ 39. They also know that commissions were wrongly paid to HSBC and that the amount of those commissions totaled $43 million while reinsurance profits

totaled $51 million.[11]   Jt. Decl. ECF No. 156-2 ¶¶ 51, 54.   Objectors' expert confirms that the Defendants maintain all the data required to determine the force-placed insurance charges/payments of individual force-placed borrowers because HSBC must maintain this information to comply with the Real Estate Settlement Procedures Act ("RESPA"), 12. U.S.C. § 2609(c)(2)(A) and Regulation X thereunder, 12 C.F.R. § 1024.17(i).   *See* Levitin Report at ¶¶ 81-101.   Defendants essentially acknowledge that they maintain all the information that is available to effectuate a claims-paid settlement. HSBC Defendants reserve the "right to audit" each claim form to determine if the information provided is accurate confirming that the information resides in their records:  "At the HSBC Defendants' discretion, the Claim Form shall be processed in accordance with the information from Defendants' records (rather than the inaccurate information on the Claim Form), and may, if necessary be denied by the Claims administrator."   Settlement Agreement, ECF No. 156-1 ¶7.5.   Thus, Defendants' clearly have access to the requisite information to confirm or deny the validity of the information on the Settlement Class members' claims forms.

The Parties claim to be unable to determine what class members paid or owe for the insurance force-placed by Defendants, stating that "HSBC cannot, on a system-wide basis, determine the precise amount paid or currently owed by a borrower."  Final Approval MOL,

---

[11] The Settlement does not account for or reimburse Class members for other means by which other costs were improperly passed on to the Settlement Class Members, such as below cost services and duplicative and unnecessary hazard insurance.  Passing on the costs for these items resulted in inflated charges to the Settlement Classes.  *See e.g.* May 21, 2012, Testimony of Birny Birnbaum, on behalf of the Center for Economic Justice, before the New York Department of                                          Financial                                          Services, http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justi ce_testimony.pdf (last visited August 19, 2014).  The Parties do not explain why they have abandoned these claims.

ECF No. 156 at 17; Jt. Decl. ECF No. 156-2 ¶ 29.[12]  This is preposterous and soundly rebutted

by Objectors' expert.  *See* Levitin Report, ¶¶ 59-63, 95-101.  HSBC can readily determine

whether borrowers paid all or a portion of the force-placed hazard insurance.  Indeed, as noted

above, RESPA requires servicers to keep such records and provide this information to borrowers

in their annual escrow statements.  *Id*. at ¶¶ 95-101; Walzak Report at ¶¶ 5-9. Further, HSBC is

able to access this information through an automated process.  *Id*.; Walzak Report at ¶ 20 ("The

MSP system provides numerous reports to servicing personnel.  In addition, individualized

reports can be created and exported into various formats such as Excel. To develop these reports,

large servicers employ analysts that produce these one-off reports. By generating such reports,

servicers should be able to determine on a system-wide basis whether all or a subset of the Class

have paid any portion of the amount charged to their escrow accounts for force-placed

insurance.").

Nevertheless, the assertion that the Defendants are unable to figure out which class

members *paid* for force-placed insurance is a red-herring and completely without merit because

the monetary relief in the present settlement is based on the "the net written premium ***charged*** to

them during the class period…."  Settlement Agreement at 16 and 17 (emphasis added).  No

calculation of payments made is even necessary.

---

[12] Significantly, Defendants do not cite to any evidence in this case in support of this statement. Instead, Plaintiffs cite discovery taken in a different case, Williams v. Wells Fargo Bank, N.A., No. 11-cv-21233-RNS (S.C. Fla.) (stating that a witness in that case testified that it would take "maybe a few hours" to "four to five hours per loan."  Final Approval MOL at 17 n. 10. Plaintiffs' Joint Declaration similarly cites exclusively to testimony from a Wells Fargo witness. Jt. Decl., ECF No. 156-2, ¶¶ 29-30.  As this case relates to HSBC's practices, testimony regarding Wells Fargo's capabilities is hardly relevant or conclusive.

**C.     Claims-Made Settlements are Disfavored by the Courts Because They Provide a Windfall to Defendants at the Expense of the Class**

With a claims-made settlement, Defendants know they will never refund even close to the $32 million which "Defendants have agreed to provide," Jt. Decl., ECF No. 156-2, ¶ 2, and which Class Counsel touts as "the monetary award [ the Settlement] will provide." Final Approval MOL at 1. Class Counsel argues that the "claims-made" structure of the settlement "does not render its terms unreasonable," and they point to the recent *Saccoccio* final approval order in support of their contention. *See* Final Approval MOL at 17. However, despite the result of *Saccoccio* – which is currently on appeal before the Eleventh Circuit – claims-made settlements are generally disfavored by courts due to the low return of claims rates. As the court in *In re TJX* noted in connection with the proposed claims-made settlement in that action:

> In any given case, class member nonparticipation may be attributed to a variety of factors: an ineffective notice program that fails to make class members aware of their rights, unappealing benefits that do not provide sufficient incentive for class members to invest the effort to submit a claim, or a claims process that is confusing, time-consuming, or requires class members to submit documentation or information they are unlikely to have in order to obtain relief.[13]  The fact remains, however, that in a reversionary common fund or a claims-made settlement, the defendant is likely to bear ***only a fraction*** of the liability to which it agrees.

*In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 404-405 (D. Mass. 2008) (emphasis added). *See also Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005)

---

[13] *See also* Max Helveston, *Promoting Justice Through Public Interest Advocacy in Class Actions*, 60 Buff. L.Rev. 749, 782–83 (2012) (noting that there are "a variety of different explanations" for low claims rates including "the difficulty of notifying class members, the overly complex and technical notifications that class members receive, the effort required to pursue a claim, the lack of interest of class members in the types of relief available, and the failure of fund designers to design claim procedures in ways that take into account cognitive biases").  The material deficiencies of the class notice, claims form, and other materials in this action are addressed *infra* in Section I.

(finding features such as "claims made settlements, payout caps based on 100 percent response rates, reverter clauses or clear sailing provisions… can work in concert to produce a settlement that is unfair, inadequate and unreasonable and that in practice yields comparably little value for the class"); *Ferrington v. McAfee, Inc.*, No. 10-cv-1455, 2012 WL 1156399, at *12-13 (N.D. Cal. Apr. 6, 2012) (denying final approval of claims-made settlement involving "a low rate of claims participation, a small claims pay out, a disproportionately large attorneys' fee award, and a reversion clause"); *De Leon v. Bank of Am., N.A.*, No. 09-cv-1251, 2012 WL 2568142, at *15 (M.D. Fla. Apr. 20, 2012) and 2012 WL 2543586 (July 2, 2012) (*adopting Mag. J. Rec. & Op.*) (denying approval of claims-made settlement with, among other things, a predictably low rate of claims-made); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 265 (E.D.N.Y. 2009) (stating, "Many of the concerns raised in [*In re TJX Cos. Retail Sec. Breach Litig*., 584 F. Supp. 2d 395, 405 (D. Mass. 2008)] regarding the small likelihood that claims would be filed are present here."); *c.f. In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1351 (S.D. Fla. 2011) (holding "the absence of a claims-made process…supports the conclusion that the Settlement is reasonable.")

Due to the judiciary's increasing awareness of abusive claims-made settlements, when evaluating the fairness of a proposed class action settlement, district courts are instructed to ask: "Is a claims process actually necessary?" and to be wary because in many cases, "the parties may negotiate a claims process which serves as a choke on the total amount paid to class members." *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010)*, at 6, at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (last visited August 19, 2014). Similarly, the *Federal Judicial Center, Managing Class Action Litigation: A Pocket*

*Guide for Judges* (3rd Ed. 2010), advises district courts to use caution when evaluating claims-made settlements: "**First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out**." *Id.* at 30, at http://www.fjc.gov/public/pdf.nsf/lookup/ClassGd3.pdf/$file/ClassGd3.pdf (last visited August 19, 2014) (emphasis added). This is precisely the situation here – the defendants indisputably have the data to automatically pay <u>at least</u> a portion of the settlement classes directly (and in fact, could pay all directly). *See* Levitin Report Section II.

The Seventh Circuit's recent decision in *Pella,* 753 F. 3d 718. at 720 is instructive. As the Seventh Circuit concluded in *Pella*, the district court erred when it did not consider the impediments presented by the claims-made process and how that reduced the real value of the settlement. *Id.* at 720. ("From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees"). The Seventh Circuit stated quite plainly, where class counsel bargained for a guaranteed fee for themselves but a claims-made process for the class with a reversion of funds to the defendant, "Class counsel sold out the class." *Id.* (emphasis added). Unfortunately, the same was done here.

Indeed, in *In re Checking Account Overdraft Litigation*, one of Class Counsel in this action supplied the declaration of legal expert Professor Samuel Issacharoff who opined that, in contrast to inferior claims-made settlements, that was "a settlement designed to compensate the class." *In re Checking Account Overdraft Litigation*, No. 09-md-02036 (S.D. Fla.), ECF. No. 1885-7 at p.5 (attached hereto as Ex. C). Present Class Counsel, along with other counsel, also formally objected to a competing claims-made settlement of similar claims in another district

court – characterizing the need to submit a claim form as "unnecessary, and unduly burdensome to class members." *See* Ex. C at p. 11.

To assist the court in evaluating the fairness of the settlement, Professor Issacharoff opined:

> Of particular significance is the manner in which the class recovery is to be distributed. The present settlement was designed to put money directly in the hands of the affected class members….Class members do not have to file claims and do not have to document anything….In the consumer context, any claims-made process is almost certain to result in many claims not being filed, sometimes to an extent that frustrates the compensatory aims of a class settlement.

Ex. C at pp. 12-13 (emphasis added). Lastly, in contrast to a claims-made settlement requiring submission of a claim form to get relief, Professor Issacharoff opined that "a system that uses the same administrative mechanism to deliver relief as was used to exact charges from these customers in the first instance is one that is designed to optimize the class recovery." *Id.* at p. 14. In the present matter, that equates to Defendants using credits to escrow accounts to automatically credit borrowers who were charged and are still being serviced by HSBC. Such relief would "optimize the class recovery" and, as discussed herein, is well within Defendants' ability to timely execute. It is very telling that Class Counsel do not submit a declaration from Professor Issacharoff in this case to try to support their settlement.

The cases cited by Class Counsel, Final Approval MOL at 18, to support their contention that a claims-made process is not objectionable do not provide support for such a process in this instance nor do they legitimize the reverse auction that led to this Settlement. The court in *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 590 (N.D. Ill. 2011), expressed concern about the claims process in the settlement before it, finding the proposed methods for submitting claims "indeed concerning." However, the *Schulte* Court concluded that the settlement could be

approved nonetheless because, *inter alia*, the record presented evidence of an "excellent response" rate (over 100,000 claims had already been filed at the time of final approval[14]) indicating that the negotiated for claim form and process was not burdensome and confusing to class members.  Just as significant, the court found it "unlikely that the claims process is designed to limit the 'take rate' of the Class Members" because the settlement created a monetary fund to be paid out in full without reversion. *Id.* at 591.  *See also Id.* at 593 (noting that a claims process is not "inherently suspect" in cases involving a common fund with an established payout "regardless of the take rate.").  In contrast, the Settlement presented here does not establish a certain fund that will be paid out to claiming class members regardless of the claim rate.  In fact, because Defendants are not required to pay out any established amount to Class Members, it is evident that the opposite is true—that is, the claims process is designed to depress the ultimate cost of the settlement so that its true value is far less than the $32 million it purports to provide to the Class Members.[15]

Moreover, the record here contains absolutely no evidence that would enable the Court to determine how the claims and claims process is actually functioning.  As such, and in contrast to both *Schulte* and *Lemus,* 2012 WL 3638550, at *5, where the record included evidence of class member participation rates, there is no basis for this Court to conclude that the claims process is not confusing and burdensome and no way for this Court to determine what the value of the

---

[14] The court concluded that the strong early response reflected on the record allowed it to rule on final approval without waiting until completion of the claims process.  *Id.* at n.22.  As noted above, no similar evidence is presented to the Court here.

[15] The claims made settlement approved in *Lemus v. H&R Block Enters., LLC,* No. 09-cv-3179, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) also cited by Class Counsel likewise established a minimum guaranteed payout to the class.  As such, it too is clearly distinguishable from the claims-made Settlement presented here.  Moreover, the court in *Lemus* expressly noted that "in general, claims-made settlements with reversions to the defendants are disfavored…." *Id.* at *5.

Settlement presented will actually be.  Accordingly, there is not any basis for concluding that this claims-made Settlement is fair or reasonable or that Plaintiffs have satisfied the requirements of Rule 23.[16]

**D.    The Settlement Favors Class Counsel and Defendants at the Expense of the Settlement Classes**

Settlements that favor the attorneys require harsher scrutiny.  Two recent Ninth Circuit cases are instructive.  In *In re Magsafe Apple Power Adapter Litig.*, No. 12-cv-15757, 2014 WL 1624493 (9th Cir. Apr. 24, 2014), the Ninth Circuit analyzed an objector's appeal of the order approving a class action settlement agreement and attorneys' fee award.  Reversing the district court's judgment and vacating the settlement fee award, the Ninth Circuit criticized the district court for "not cross-check[ing] the attorneys' fee award against the percentage –of-the-recovery method," finding that the lack of mention of the value of the settlement, "let alone the percentage-of-the-recovery method, contributes to our determination that we lack a sufficient basis for determining the reasonableness of the award."  *Id.* at *3 (citation omitted) (internal quotation omitted).  Additionally, the Ninth Circuit found that having "conducted the fairness hearing before the claims-submission period closed" provided "no reliable way of estimating how many valid claims were submitted or the total amount that [defendant] intends to pay claimants…."  *Id.*  Further, the Ninth Circuit found that "the district court erred by not

---

[16] The other cases cited by Class Counsel to support the propriety of claims-made settlements, *Shames v. Hertz Corp.*, No. 07-cv-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012); *Williams v. MGM-Pathe Commc'ns Co.,* 129 F.3d 1026 (9th Cir 1997) and *Atkinson v. Walmart Stores, Inc.*, No. 08-cv-691, 2011 WL 6846747 (Dec. 29, 2011 M.D. Fla. 2011), are also unavailing. *Williams* addressed only whether awarding a specified amount of fees in a case with an indefinite payout to the class would equate to impermissible fee shifting, holding it would not.  *Atkinson* concerned unique claims of estates of deceased persons under corporate owned life insurance policies making a claims process reasonable.  And in *Shames,* the claims process gave class members the ability to choose between different recovery options and so was found to maximize the value of the settlement to the class.  *See* 2012 WL 5392159, at *12.

addressing the indicia of self-dealing or implicit collusion" because the court "did not assess with specificity whether class counsel received a disproportionate share of the settlement, nor did it mention the clear-sailing provision or the implied reversion clause." *Id.*

The Ninth Circuit also addressed this issue in *Laguna v. Coverall N. Am., Inc.*, 753 F.3d 918, 924-25 (9th Cir. 2014) warning that a district court must consider the possibility of collusion in settlements:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded; (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds ...; and (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Laguna,* 753 F.3d at 924-25 (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011)).  *See also In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) (reversing approval of class action settlement as illusory because settlement gave preferential treatment to class counsel while only perfunctory injunctive relief to class members who received no true value from relief).  The proposed settlement includes each of these features:  (1) Class Counsel will be receiving a disproportionate fee award when compared to the actual, anticipated claims rate; (2) the parties negotiated a clear sailing provision and provided a separate provision for attorneys' fees and costs (Settlement Agreement ¶¶ 8.2 and 15.2); and (3) the Settlement Classes will receive far less than the amount of the funds to which they might be entitled, leaving those funds in Defendants' hands.

**E.    The Settlement Does Not Take Into Consideration All of the Ways in which Defendants Generated Illicit Profits and Improperly Releases Claims Based Thereon, Including RICO Claims for Treble Damages Asserted in the *Montanez* Action**

Class Counsel present their arguments in favor of the Settlement as if the challenged commission payments were the only way Defendants generated illicit profits by way of the force-placed insurance scheme in place throughout the Class Period.  This is not the case.  As demonstrated by public hearings and discovery in analogous force-placed insurance actions, lenders like HSBC along with Assurant derived illicit profits through a number other avenues.  *See, e.g.*, May 21, 2012, Testimony of Birny Birnbaum, on behalf of the Center for Economic Justice, before the New York Department of Financial Services, http://www.dfs.ny.gov/about/hearings/fp_052012/Birny_Birnbaum_Center_for_Economic_Justice_testimony.pdf (last visited Aug. 19, 2014) (identifying charges for below cost services and duplicative and unnecessary insurance as other improper charges yielding profits for lenders and LPI providers).

As such, the Settlement fails to take into account all of the avenues of recourse.  Class Counsel's failure to pursue a settlement which encompasses *all* of the ways in which Defendants generated illicit profits through their force-placed insurance business comes at the expense of Settlement Class members who, by the terms of the agreed-upon release, will forever and finally be precluded from pursuing relief for these practices.

More specifically, Section 10 of the Settlement Agreement contains the release in this action that was negotiated and agreed upon by Class Counsel.  It provides that upon the Final Settlement Date, the Settlement Class members:

> [S]hall be deemed to have fully, conclusively, irrevocably, forever, and finally released, relinquished, and discharged the Released Parties, along with their respective past, present and former dividions, predecessors, successors and assigns, and the past

present and former directors, officers, employees, agents, insurers, shareholders, attorneys, advisors, consultants, representatives, partners, joint ventures, independent contractors, wholesalers, resellers, distributors, retailers, predecessors, successors and assigns of the Released Parties and of each and every other person and entity described in this Paragraph, from any and all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands of any kind whatsoever that each Settlement Class Member may have on or before the Effective Date or may have had in the past, whether in arbitration, administration,  or judicial proceedings, whether as individual claims or as claims on a class basis, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, whether based on federal, state, or local law, statute, ordinance, regulations, contract, common law, or any other source, that were or could have been sought or alleged in this Action or that relate, concern, arise from, or pertain in any way to the Released Party's conduct, policies, or practices concerning LPI Policies placed or charged by any of the Released Parties during the Class Period.

Settlement Agreement ¶ 10.1.  This release is impermissibly overbroad in numerous respects.

First, as noted above, Class Counsel predominantly sought recourse from Defendants for practices related to unlawfully assessed commissions, and failed to account for other unlawful practices such as tracking or below cost services.  Second, the release encompasses RICO claims for treble damages that were asserted by Objectors and the putative class members in the *Montanez* Action that were not asserted by Mr. Lopez or Ms. Diaz.  While this Court had originally determined that such claims would be beyond the scope of the release in this Settlement, ECF No. 114 at 1, in response to Defendants' request for clarification this Court modified its earlier  Order *nunc pro tunc* to specify that class members' RICO claims *would* also be foreclosed were this Settlement finally approved in this action.  ECF No. 148.

Given the breadth of the Release as interpreted by this Court, the proposed release will work a disservice to the Settlement Class, as it would forever and finally release any and all claims related to these unaccounted for improper practices during the Class Period.

**F.     Without Knowing the Number of Claims Received – and Accepted as Valid by Defendants -- the Court Cannot Approve the Settlement**

The Settlement Agreement is written so that the deadline to submit claims will not run until sixty (60) after the final approval hearing and after any appeal period has expired.  Class Notice, ECF No. 156-3 at ¶ 8.  Accordingly, Class Counsel and Defendants ask this Court to extinguish the claims of hundreds of thousands of HSBC borrowers[17] without knowing how many Class members will receive *any* monetary recovery under the Settlement.  This is wholly improper.  *See Pella*, 2014 WL 2444388, at *10 (rejecting claims-made settlement where there was an "extended period of time that class members can make claims after the date of final approval [making] it is impossible to estimate the actual value of the settlement, other than, it is sure that the claims rate will be exceedingly low due to the obstacles 'strewed in the path of the class members.'"); *see also In re Excess Value Ins. Coverage Litig.*, MDL No. 1339, 2004 WL 1724980, at *13 (S.D.N.Y. July 30, 2004) ("*Excess I*") ("At this time, without knowing the rate at which Class Members will redeem the UPS Vouchers, the Voucher program cannot, in fact, be valued with precision.").

**G.     Class Counsel Fail to Provide This Court With Sufficient Information to Properly Evaluate Their Attorneys' Fee Request**

Class Counsel ask this Court to award them $10 million in fees and expenses, but do not provide any justification for the request other than noting that they negotiated such a payment with counsel for Defendants.  Instead, Class Counsel repeatedly offers two (2) figures --

---

[17]There are 252,464 Class members.  Final Approval MOL at 1.

"31.25% of the monetary recovery" and "7.9% of the overall benefit/value"[18] as an attempt to justify the amount requested.  Final Approval MOL at 1 & 21.  Moreover, while Class Counsel attempt to support their fee request by discussing the Eleventh Circuit's factors for evaluating a fee request, their analysis falls short, only addressing about half of the factors articulated in *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 772 n.3 (11th Cir. 1991).  *See* Final Approval MOL at 22-27.  Notably absent from the record is any evidence of the number of claims submitted and the number of Class Members who actually will receive compensation under the Settlement.  Simply stated, the record is not sufficiently developed for this Court to properly evaluate Class Counsel's fee request.  It should therefore be denied.

### 1. A Lodestar Cross-Check, Which May Be Used to Confirm the Reasonableness of a Fee Application, Is Not Possible Here

Although the Eleventh Circuit has determined that the lodestar method of calculating attorneys' fees is not the proper method for awarding fees in common fund cases, courts within the Circuit have determined that a lodestar cross-check may be useful.  *See, e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999) (noting "we may refer to that [lodestar] figure for comparison"); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 3d 1334, 1343 (S.D. Fla. 2007) ("Some courts use the lodestar method as a cross-check of the percentage of the fund approach"); *In re Sunbeam*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (same).  *See also In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-md-1317, 2005 WL 2451958, at *2 (S.D. Fla. July 8, 2005) (court examined counsels' hours spent litigating and regular hourly rates to evaluate fee request "in light of the lodestar crosscheck").[19]  Such a cross-check is not

---

[18] *See, e.g.*, Final Approval MOL at 21.

[19] Indeed, two district courts have recently noted that attorneys' fees in claims-made settlements should be calculated utilizing the lodestar method because such settlements do not create traditional common funds, rendering the percentage of the fund approach inapplicable.  *See*

possible here, given that Class Counsel have failed to provide the Court with **any** time records

for their litigation.  Class Counsel merely declared that litigating and settling the claims in this

action has "demanded considerable time and labor" and that they spent "many hours"

investigating the claims involved.  Final Approval MOL at 24.[20]  These unsubstantiated

statements are an inadequate basis for approval.

> **2.**    **Class Counsel's Percentage of the Recovery Argument is Meritless Because the Actual Recovery in this Action is Unknown Due to the Claims-Made Structure of the Settlement**

As noted above, Class Counsel repeatedly tout their attorneys' fees request as

representing only 31.25% of the monetary value of the settlement, and only 7.9% of the total

settlement including the injunctive relief.  For the reasons discussed herein, the injunctive relief

portion of the Settlement provides *de minimis* benefit to the Settlement Class because the

majority of the injunctive relief outlined in the Settlement is one or more practices that HSBC is

either under an obligation to, or has already agreed to, cease.  Accordingly, the "value" that Class

Counsel assigns to the injunctive relief portion of the Settlement is not supported by the facts.

The calculation of attorneys' fees as a percentage of the Settlement including the injunctive relief

is therefore also erroneous.

Class Counsel's argument that the $10 million fee application represents 31.25% of the

cash portion of the Settlement is flawed as well.  The Settlement as structured requires

Settlement Class Members to submit a claim form in order to receive any monetary relief.  *See,*

---

*McLennan v. LG Elecs. USA, Inc.*, No. 10-cv-03604, 2012 WL 686020, at *10 (D.N.J. Mar. 2, 2010) ("Courts in this district have previously found the lodestar method to be appropriate in these cases as claims made settlements cannot be characterized as true 'common fund[s]' for purposes of the percentage-of-the-fund analysis.")(citation omitted); *Kakani v. Oracle Corp.*, No. 06-cv-06493, 2007 WL 1793774, at *5 (N.D. Cal. June 19, 2007) ("We must remember that the Settlement this is a claims-made settlement, not a common fund settlement").

[20] Moreover, much of the discovery is from a different action and irrelevant to their supposed efforts here.  *See* Final Approval MOL at 17 and Jt. Decl., ECF No. 156-2 ¶¶ 29, 30.

*e.g.*, Settlement Agreement, Dkt. No. 156-2, at §§ 3.1.1 and 3.1.2 (only those "Settlement Class Members who submit a timely, valid, and verified Claim Form" will receive a Settlement Payment).  Accordingly, the true and accurate amount of the Settlement will not be determined until all claim forms have been processed.  *See, e.g., Excess I,* at *13 ("At this time, without knowing the rate at which Class Members will redeem the UPS Vouchers, the Voucher program cannot, in fact, be valued with precision.").

The reaction of the Settlement Class is an important consideration for this Court to evaluate the propriety of both the Settlement and the request for attorneys' fees.  *See, e.g., Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (listing "the substance and amount of opposition to the settlement" as a factor to be analyzed in connection with the final approval of a settlement); *Camden I Condo. Assoc.,* 946 F.2d at 775 (noting in attorneys' fee analysis "whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel" is a "pertinent factor").  In justification for the proposed Settlement, Class Counsel note that "As of the date of this filing, there has been only one objection to the settlement.  This individual represents 0.0004% of the 252, 464 class members served."  Final Approval MOL at 25, concluding that this one objection supports the fee request.[21]  Similarly, to substantiate their fee request, Class Counsel note that "there has been only one possible objection to the settlement," questioning whether it is even "an 'objection' to the Settlement," and concluding that this lack of objections "supports the fee request."  *Id.* at 24. However, while Class Counsel offers these numbers for the Court's consideration, Class Counsel fail to provide any data regarding the return of Settlement Class members' claim forms.  As the *Sylvester* court aptly noted, this information is an important consideration:

---

[21] Notably objections were not yet due on the day Plaintiffs submitted their final approval papers. *See* Settlement Agreement ¶ 2.20.

> However, in considering the "reaction of the class," the Court also considers the relatively small percentage of class members (19.7 percent) who have expressed implicit support for the proposed settlement by returning claim forms as well as the vast majority that have remained silent and essentially expressed a reaction of utter indifference to the settlement. Given that the large majority of Class Members fall into this latter category, the Court finds the reaction of the Class is a factor that weighs neither in favor of approving or rejecting the proposed settlement.

*Sylvester*, 369 F. Supp. 2d at 49. As such, Class Counsel's failure to provide any information regarding the claims rate by Settlement Class Members in this action necessarily prevents this Court from undertaking an analysis like that done by the *Sylvester* court, which properly interpreted the lack of claims submissions from the class as a factor which must be considered.

### H.   The Majority of the Injunctive Relief Provisions of the Settlement Add No Value to the Settlement and Do Not Justify the Requested Fees

The Settlement purports to deliver additional benefits to the Class through five injunctive relief provisions that enjoin and/or mandate specified practices that were at issue in the litigation. However, as Professor Levitin opines in his report, majority of the injunctive relief terms in the Proposed Settlement "have no value to the Class because they "merely re-create pre-existing legal duties and functional market requirements." Levitin Report at ¶ 24. As such, these provisions add nothing to the fairness of the Settlement. *See, e.g.*, *Pella*, 2014 WL 2444388, at *8 (finding provisions agreed to prior to the settlement "were not part of the value created by the settlement, although the settlement" prohibited defendant from revoking the provisions). More particularly, "all of the injunctive relief terms are already either required by federal regulation, by the terms of other settlements, or by the terms under which the Federal Housing Finance Administration will permit the federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Company (Freddie Mac) to purchase mortgages." Levitin Report

31

at ¶ 25.[22]   As such, the injunctive relief provisions lauded in the approval papers are *not* a product of *this* Settlement and cannot qualify as consideration for the agreement or value supporting Class Counsel's fee request.  *See Klee, et al. v. Nissan N. Am., Inc.,* No. 12-cv-08238 (C.D. Cal.), ECF No. 50 at 7 (personal objection by Chief Judge of the United States Court of Appeals for the Ninth Circuit wherein relief purportedly negotiated by way of the settlement had already "been fully implemented" outside of the settlement and therefore could not be consideration for the settlement).[23]

### 1.    The Injunctive Relief Adds No Value to the Settlement and Does Not Justify the Requested Fees

Professor Levitin's conclusion that the injunctive relief terms add no value to the Class is based upon his examination of each of the injunctive provisions included in the Settlement and the fact that HSBC and Assurant are already obligated by the terms of settlements they have previously entered with state attorneys general and insurance departments, new federal regulations and Fannie Mae Servicing Guides to refrain from the practices purportedly prohibited by this Settlement.  Levitin Report at ¶¶ 21-54.  The specific injunctive terms considered by Professor Levitin are:  (1) The "*HSBC No- Kickback Provisions*;"[24] (2) The "*Dual Interest Provision*;"[25] (3) The "*Coverage Limitation Provision*;"[26] (4) the "*Prompt Recredit Provision*;"[27] and (5) The "*Assumption of Existing Coverage Provision.*"[28]  *See* Levitin Report, at ¶ 22.

---

[22] Professor Levitin's statement specifically excludes the "Dual Interest Provision" and the "Prompt Recredit Provision" from this conclusion.  *Id.*

[23] The *Klee* Court has not yet ruled on this objection.  The case is currently stayed for mediation between the parties and the objectors.

[24] "For a period of six (6) years … the HSBC Defendants will continue to not accept any financial interest in the placement of LPI Policies, other that the LPI premiums and the protection afforded by the LPI Policies on the properties serving as collateral.  Settlement Agreement. ¶ 4.1.1.

[25] "LPI Policies obtained by the HSBC Defendants shall continue to be dual interest."

Professor Levitin opines on the injunctive relief provisions related to defendants Assurant, Inc. American Security Insurance Company, and Standard Guaranty Insurance Company.  The specific injunctive term Professor Levitin considers with respect to the Assurant Defendants is the "*Assurant No-Kickbacks Provision*." [29]  *See* Levitin Report, ¶¶ 36-41.

With regard to each of these terms, Professor Levitin demonstrates – by citation to specific regulations, Fannie Mae and Freddie Mac guidance, particular market and industry constraints now in place,[30] settlement provisions and/or consent order terms (discussed below) —that the injunctive relief terms merely duplicate existing legal duties and obligations.  *Id.* at Section I.  Because the injunctive terms provide no new constraints or obligations on the Defendants, they add "no value to the Class."  *Id.* at ¶¶ 24, 48.

---

[26] The LPI policies obtained by the HSBC Defendants shall be established at the amount of coverage of the borrower's previous hazard insurance policy or the unpaid principal loan balance."  Settlement Agreement ¶ 4.1.4.

[27] "The HSBC Defendants will credit a borrower's account(s) with any LPI refund that is due the borrower within fifteen (15) days of receipt of the required evidence of acceptable voluntary insurance coverage for the property."  Settlement Agreement ¶ 4.1.6.

[28] "The HSBC Defendants shall advance funds to maintain a borrower's voluntary hazard insurance policy in force where the HSBC Defendants learn that the policy would otherwise lapse due to non-payment…"  Settlement Agreement ¶ 4.1.5.

[29] The Assurant Defendants shall not provide any of the following to the HSBC Defendants: (a) LPI commissions to agents or brokers affiliated with any of the HSBC Defendants; (b) LPI quota-share reinsurance arrangements with insurance companies.

[30] For example, Professor Levitin explains that the terms under which the Federal Housing Finance Administration will permit the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Company (Freddie Mac) to purchase mortgages effectively control the terms that prevail in the mortgage origination market because Fannie Mae and Freddie currently provide about 75% of the funding for the mortgage origination market through their secondary market purchases.  Those terms are merely duplicated by injunctive provisions of the settlement.  Levitin Report at ¶¶ 28-35.

### 2.   The Injunctive Relief Merely Duplicates Specific Pre--Existing Requirements

As explained by Professor Levitin, each of the five injunctive provisions considered covers ground already subject to preexisting requirements, obligations or regulations.  Thus, the *HSBC No-Kickback Provision* replicate requirements imposed by Regulation X.  These terms also replicate Fannie Mae and Freddie Mac's implementation of the FHFA forced-placed insurance policies and directives, and the incorporation of Fannie Mae/Freddie Mac requirements in Consumer Protection Financial Protection Bureau Truth-In-Lending Act Ability to Repay requirements, which further incentivize compliance with Fannie Mae/Freddie Mac eligibility requirements.  *Id.* at ¶¶ 26-35.

Similarly, the *Assurant No-Kickback Provision* "replicates what is already legally required of defendant Assurant and American Security Insurance Companies' Consent Orders with the New York State Department of Financial Services and the Florida Office of Insurance Regulation."  Levitin Report at ¶ 36.  *See also id.* at ¶¶ 37-41.  Professor Levitin also explains that the *Coverage Limitation Provision* and the *Assumption of Existing Coverage Provision* both replicate what is already legally required by Regulation X under RESPA.  Levitin Report at ¶ 42-44.

In sum, as demonstrated by Professor Levitin's analysis, the majority of the injunctive relief provisions of the Settlement provide no added benefit to the Settlement, leading him to conclude that they "have no value to the Class."  *Id.* at ¶ 48.[31]

---

[31] To the extent, that the Dual Interest Provision and the Prompt Recredit Provision do not recreate already existing legal or market requirements, Professor Levitin opines, "these provisions provide only de minimis or even negative value for Class members and are not the core of the Proposed Settlement's injunctive relief provisions."  Levitin Report, ¶ 49.

The "value" of pre-existing  obligations and duties resulting from the work of outside entities and attorneys that put in place the regulations, guidelines and agreements that already govern HSBC and Assurant's  conduct going forward clearly is not attributable to the Settlement, nor to the efforts of Class Counsel.  As such, it cannot be viewed as consideration supporting the Settlement or justifying the requested attorneys' fees.

**I.     The Proposed Settlement is Not Fair Because the Notices of Class Action Settlement, Class Action Claim Forms and Instructions are Materially Deficient**

The Notices are materially deficient and misleading. Most importantly; nowhere is the involvement of Javier Lopez or the fatal conflict arising from his serving as Class Representative while being an attorney with Class Counsel discussed.  Further, as discussed above, the Notice represents a Settlement value to the class that is far greater than the anticipated payout by Defendants and does not adequately disclose that the Settlement does not provide for enough funds to deliver the 13% or 6% payments to all Class Members if they actually submitted claims. This information is material information that Class Member's must have in order to make informed decisions about participating in the Settlement.  *Pella*, 753 F.3d at 723-724 (Noting in rejecting a class action settlement that " it was improper for the lead class counsel to be the son-in-law of the lead class representative. Class representatives are, as we noted earlier, fiduciaries of the class members, and fiduciaries are not allowed to have conflicts of interest without the informed consent of their beneficiaries, which was not sought in this case.").

Additionally, the Claim Forms are also confusing and intimidating. Members of the Settlement Classes who elect to make a claim are instructed, with various cross-references to supply various forms and, under penalty of perjury, to verify specific information about their force-placed insurance policies.  *See* Claim Form, ECF No. 156-3.  However, because borrowers do not choose their force-placed insurance providers, and the class period dates back several

years, a significant number of potential claimants certainly will not have copies of their policies available to verify such information and will not risk penalties of perjury to submit a claim when they are unsure of what is being asked. This feature of the proposed settlement will reduce the claims rate – to the benefit of Defendants.

Moreover, although the Settlement Class includes borrowers who have filed for bankruptcy or whose properties have been foreclosed upon, the Claim Form instructs that a certain number of these borrowers are not eligible to recover under the claims process. *See id.* (requiring claimants to affirm "Since the issuance of the LPI Policy, I have not filed a Petition under Chapter 7 of the United States Bankruptcy Code, and my indebtedness on my residence secured by my Deed of Trust or Mortgage has not been compromised or discharged by in bankruptcy"). These Class Members will have their claims released, but they are not entitled to any compensation.

### J. Objectors Seek Additional Information from the Parties

In conjunction with their objections enumerated above, Objectors request that the Court permit them to serve a limited set of discovery requests. As such, Objectors seek leave to serve limited requests for production of documents and interrogatories on Class Counsel and Defendants substantially in the form attached hereto as Exhibits D through G.

### III. CONCLUSION

As Judge Posner recently stated in *Pella*, this "case underscores the importance both of objectors (for they are the appellants in this case—without them there would have been no appellate challenge to the settlement) and of intense judicial scrutiny of proposed class action settlements." *See Pella*, 753 F.3d at 721. Objectors request that this Court apply the same "intense judicial scrutiny" to the proposed settlement and deny final approval. Objectors are

willing to participate in mediation to determine whether the objections can be resolved by making changes and improvements to the Settlement.

DATED:  August 19, 2014

Respectfully submitted,

**ARONOVITZ LAW**

*/s/ Tod Aronovitz*
Tod Aronovitz (FBN 186430)
One Biscayne Tower, Suite 2630
2 South Biscayne Boulevard
Miami, FL  33131
Telephone: (305) 372-2772
Facsimile: (305) 397-1886
Email: ta@aronovitzlaw.com

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Edward W. Ciolko (*Pro Hac Vice*)
Peter A. Muhic (*Pro Hac Vice*)
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: eciolko@ktmc.com
Email: pmuhic@ktmc.com

**LOWEY DANNENBERG
COHEN & HART, P.C.**
Barbara Hart
Jeanne D'Esposito
Scott V. Papp
David C. Harrison
One North Broadway, Suite 509
White Plains, NY  10601-2301
Email: bhart@lowey.com
Email: jdesposito@lowey.com
Email: spapp@lowey.com
Email: dharrison@lowey.com

*Counsel for Plaintiff Objectors,*
**DEBRA KIRKTINDOLL, TIMOTHY
BROOKS, JEAN FRANCOIS AND PATRICIA
DEHAERNE, AND MARK AND TAMMY
WAKEFIELD, LAQUENTA AND SERGIO
MONTANEZ, CHRISTOPHER MAXWELL,
MATT AND GLADYS WOODEN**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 19, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day, via transmission of Notices of Electronic Filing generated by CM/ECF or via other transmission, on all counsel of record.

By: *  /s/ Tod Aronovitz*

Dated:  August 19, 2014

_____
Debra Kirktindoll

Dated:  August 19, 2014

Timothy Brooks

Dated: August 19, 2014

_____
Jean Francois DeHaerne

Dated: August 19, 2014

_____
Patricia DeHaerne

Dated:  August 19, 2014

_____

Mark Wakefield

Dated:  August 19, 2014

_____

Tammy Wakefield

Dated:  August 19, 2014

_____   8/19/2014
Christopher Maxwell

Dated: August 19, 2014

_____
Matt Wooden

Dated: August 19, 2014

_____
Gladys Wooden